**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION**

| | | |
|---|---|---|
| LEGENT COMM, LLC, | § | JURY TRIAL DEMANDED |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CASE NO. 5:19-CV-202 |
| | § | |
| BILLING CONCEPTS, INC., | § | |
| | § | |
| Defendant. | § | |

## ORIGINAL COMPLAINT

Plaintiff, Legent Comm, LLC, files this Original Complaint against Defendant, Billing Concepts, Inc., and respectfully states as follows:

## PARTIES

1.  Legent Comm, LLC, Inc. ("Plaintiff") is a Nevada limited liability company that maintains its principal place of business in Las Vegas, Nevada. It does not have any member who is a citizen of Delaware or Texas.

2.  Billing Concepts, Inc. ("Defendant") is a Delaware corporation that maintains its principal place of business at 7411 John Smith Drive, Suite 1500, San Antonio, Texas 78229. Defendant's Texas registered agent is Corporation Service Company d/b/a CSC-Lawyers Incorporating Service Company, 211 E. 7th Street, Suite 620, Austin, Texas 78701-3218.

3.  Defendant is one of several operating subsidiaries of Billing Services Group Limited ("BSG"), a British holding company that is publicly traded on AIM (a market operated by the London Stock Exchange plc). The BSG companies will be collectively referred to as the "BSG Entities" herein. Upon information and belief, the BSG Entities are centrally controlled by the same board of directors and same employees from their common headquarters in San Antonio,

Texas and for the most part operate under the BSG name.

## JURISDICTION AND VENUE

4.   This court has subject matter jurisdiction because this is a civil action between citizens of different states, and the amount in controversy exceeds $75,000, exclusive of interest and costs. 28 U.S.C. § 1332.

5.   Venue is proper in this District because a substantial part of the events or omissions giving rise to the claims occurred in this District, 28 U.S.C. § 1391 and because Section 20 of the contract that is the subject of this action contains a forum selection clause mandating venue in the state or federal courts located in Bexar County, Texas.

## FACTS

**A.     Plaintiff's Long Distance Business and Its Use of Defendant's LEC Billing Services.**

6.   Plaintiff is a regulated Interexchange Carrier ("IXC") who is authorized to provide long distance telephone service to residential and business customers. Plaintiff provides presubscribed one-plus (1+) long distance phone services to customers in multiple states throughout the country.

7.   As an IXC, Plaintiff is subject to regulation by the Federal Communications Commission ("FCC") and regulatory authorities in the states in which it provides long distance services.

8.   Plaintiff does not possess the embedded infrastructure, networks, or billing platforms. Instead, it purchases and resells its telecommunications services, and is known as a "Reseller." Resellers like Plaintiff have been found by regulators to increase competition in the long distance markets and increase customer choice.

9.   A local telephone company that is authorized to provide landline telephone service in a particular geographic region is called Local Exchange Carrier ("LEC").  Companies like AT&T

and Verizon have multiple regional operating subsidiaries that are the incumbent LECs in many regions in the United States.

10. For Plaintiff to bill its customers, it has the choice of either sending a bill directly to the customer, or having its charges included on the relevant LEC's landline telephone bill to that customer.

11. When a LEC provides the service of including third-party charges on its bills, that service is called "Third-Party Billing" or "LEC Billing."

12. Defendant is one of several BSG Entities that provide the service of aggregating third-party telecommunications charges for purposes of facilitating LEC Billing for companies like Plaintiff and are referred to as "aggregators" or "clearinghouses" because they aggregate and provide billings services to firms that wish to have their charges appear on LEC bills.  The most economically feasible way for Plaintiff (and other similarly situated companies) to bill its customers via LEC Billing is to use a billing clearinghouse like Defendant.

13. The BSG Entities have been and may still be the largest LEC Billing clearinghouse in the United States and operate under a complex structure involving multiple corporations and limited liability companies.

14. While the composition of the BSG Entities have changed over the years due to restructuring, mergers and acquisitions, Plaintiff has contracted with Defendant since 2001.

15. By contracting with a clearinghouse, Plaintiff does not have to negotiate separate agreements and set up separate systems for LEC Billing with different LECs across the country.

16. A simplified description of the mechanics of LEC Billing is as follows:

    a.    Plaintiff submits its billing records to Defendant in a standardized electronic format.

   b.    Defendant processes and distributes the records to the relevant LEC in a
         form acceptable to the LEC.

   c.    The relevant LEC collects payments from Plaintiff's customers and remits
         the funds less the LEC's fees and other amounts to Defendant.

   d.    Defendant then distributes the funds less its fees and other amounts to
         Plaintiff.

17. The LEC Billing process is more complex than the simplified description because
payments are often made in advance of collections with reserves applied to cover "assessments."
Assessments include fees, expenses, and holdbacks and are periodically reconciled using
adjustments referred to as "true-ups."

18. Since there are typically thousands of billing records in the pipeline at any given time,
the accounting, flow of money and assessments are, complicated, computerized and generate
massive amounts of data which needs to be tracked, analyzed and reconciled.

**B.    Plaintiff and Defendant's LEC Billing Contract.**

19. Plaintiff's principal, Scott White, had dealt with Defendant and its predecessor for LEC
Billing through other businesses since at least 1995.

20. The parties' LEC Billing arrangement is governed by a formal contract entitled *One
Plus Billing and Information Management Services Agreement*, (hereinafter referred to as the
"Services Agreement").  The original Services Agreement was dated September 14, 2001 and has
been renewed and amended from time-to-time.[1]

21. The Services Agreement is governed by Texas law pursuant to Section 20 of the

---

[1] Plaintiff has not attached the Services Agreement to the Complaint because it contains a
confidentiality provision.  Plaintiff will accordingly limit its references to the Services Agreement
to maintain its confidentiality.

Agreement.

22. Effective December 10, 2013, the Services Agreement was assigned in its entirety from Legent Communications Corporation to Plaintiff pursuant to a formal Assignment and Assumption Agreement signed by Plaintiff and Defendant.

23. The Services Agreement purports to incorporate the agreements between Defendant and the LECs ("LEC Agreements") by reference.[2]   Despite the purported incorporation by reference, Defendant has never provided copies of the underlying LEC Agreements to Plaintiff on the grounds that they are proprietary and confidential.  Consequently, the Services Agreement's purported incorporation of the LEC Agreements by reference is invalid and unenforceable under Texas law.

24. The LEC Billing services provided to Plaintiff under the Services Agreement include billing for other IXCs who bill through the Services Agreement with Defendant's knowledge and permission. Plaintiff in turn provides administrative services to those IXCs and receives compensation from the other IXCs for providing such services.

25. The LEC Billing process described above between Plaintiff and Defendant is not effectuated by simply providing charges to Defendant and the LECs for collection and payment. Instead, the billing, collection and payment process is effectuated through the purchase and sale of accounts receivable.

26. Specifically, when Plaintiff submits billing records to Defendant, Defendant *purchases* the accounts receivable generated by the Plaintiff's billing records and Defendant in turn *sells* the same accounts receivable to the relevant LEC who *purchases* the accounts receivable from

---

[2] *See*, *e.g.*, Services Agreement, Sections 3(d) and 6(a), and Definition of "LEC Agreement" at p. 13.

Defendant.

27. The accounts receivable that are purchased and sold are referred to in the parties' business reports as "PARs" (**P**urchased **A**ccounts **R**eceivable). In other words, the LEC Billing transactions involve the purchase and sale of PARs.

28. When the PARs are purchased and sold, corresponding payment obligations are imposed on the party who purchased the accounts receivable. In other words, Defendant is obligated to pay Plaintiff for its purchases and the LECs are obligated to pay Defendant for their purchases.

29. As noted above, payments are often advanced based on projected collections and are subject to adjustment via "true-ups" for bad debt, dilution, reserves and other deductions. Because of Plaintiff's good business practices, Plaintiff's true-ups are usually positive, meaning that the reserved amounts are less than the actual bad debt or other loss experience.

30. The terms of the purchase and sale of accounts receivable are governed primarily by Sections 6, 7 and 8 of the Services Agreement.

31. For a third-party IXC to submit charges to a LEC through a clearinghouse, the IXC must also participate in a Sub-Carrier Information Code ("Sub-CIC") application process with the clearinghouse and the relevant LEC. Accordingly, Plaintiff and the other IXCs who bill through Plaintiff's contract with Defendant are also commonly referred to as Sub-CICs. Attaching this code to all transactions gives Defendant and the LECs the ability to identify which costs and revenues are to be allocated to the correct Sub-CIC.

**C.    BSG's Involvement with Enhanced Service Providers.**

32. In addition to providing LEC Billing services to IXCs who provide long distance telephone service, the BSG Entities provided LEC Billing services to companies that provide other

6

services, including unregulated services.

33. The unregulated services are commonly known in the industry as "enhanced services." Enhanced services are products or services unrelated to the completion of a telephone call; they can include services such as website hosting, directory listings, e-mail, voicemail, and streaming video services.

34. Enhanced Service Providers typically market the service directly to the consumer, often through internet advertising. If the consumers sign up for the offered service, the consumers ostensibly agree to be charged for the services on their local telephone bill.  Due to apparent lax oversight, enhanced services billing has a history of problems ranging from inaccurate billing to outright fraud.

35. The BSG Entities have had a history of problems stemming from providing LEC Billing services to Enhanced Service Providers and other unscrupulous companies who engage in the unlawful practice known as "cramming."[3]

36. Cramming is the practice of placing unauthorized charges on a customer's LEC bill without a customer's consent or due to the consent having been obtained through deceptive or fraudulent means.

37. Cramming violations are enforced by the FCC, the Federal Trade Commission ("FTC"), and state public utility commissions.

**D.     The AT&T and Verizon Class Actions.**

38. In April 2009, two class action lawsuits were commenced against AT&T and Verizon for cramming stemming from LEC Billing originated by the BSG Entities and other aggregators

---

[3] See Section D, *infra*.

("Class Actions").  Those cases were settled in 2013.[4]

39. Neither Plaintiff nor any of the IXCs who submit LEC Billing through the Services Agreement were parties to the Class Actions.

40. According to the settlement agreement in the AT&T class action, the "vast majority" of the cramming claims stemmed from unauthorized charges for "enhanced services" appearing on AT&T customers' bills. AT&T eliminated third-party billing for "enhanced services" as of September 12, 2012 to put an end to the practice.[5]

41. According to the Court's Order granting final approval of the settlement in the Verizon class action, the billing for "miscellaneous or enhanced services" were the "services that have generated the bulk of the cramming complaints." Verizon eliminated third-party billing for enhanced services as of December 31, 2012.[6]

42. BSG's 2011 Annual Report similarly observed that sale and billing for "enhanced services" precipitated the commencement of the Class Actions and related regulatory exposure:

> In 2010, as the result of consumer complaints and class action litigation against LECs, the largest LEC in the United States added new restrictions on third party billing for ***enhanced services***. The restrictions resulted in a substantial reduction in the volume of transactions billed through the Company. In December 2010, the federal government announced an investigation into alleged "cramming" (inclusion of unauthorized charges) by some participants in the telecommunications industry, including third party billers. ***Substantially all of the issues identified by the LECs and the federal government involve charges for enhanced services.***

---

[4] *Nzabueze v. AT&T, Inc.*, 3:09-cv-01529 (N.D. Cal.) and *Moore v. Verizon Communications, Inc.*, 4:09-cv-01823 (N.D. Cal.).

[5] *Settlement Stipulation and Agreement*, Docket No. 153-1, December 28, 2012 at p. 16.  *Nzabueze v. AT&T, Inc.*, 3:09-cv-01529 (N.D. Cal.).

[6] *Order* [granting final approval of class action settlement] Docket No. 196, August 28, 2013 at p. 7 lines 1-6, *Moore v. Verizon Communications, Inc.*, 4:09-cv-01823 (N.D. Cal.).

> As expected, the audit reached a successful conclusion. Unfortunately, the successful audit did not translate to a resumption of normal billing for **enhanced services**. **Instead, the three largest LECs have informed the Company that they will cease accepting third party charges for enhanced services during the course of 2012.**
>
> With respect to the Congressional investigation announced 18 months ago, BSG has not received any communication from the investigating body. The Company did receive notice, however, that **the Federal Trade Commission ("FTC") has initiated an action against the Company for alleged violation of a 1999 settlement agreement with a subsidiary, as previously announced.** The Company believes there is no merit in the FTC's allegations and intends to vigorously defend itself.

*Billing Services Group Limited Annual Report* for the year ended December 31, 2011. (Emphasis added).

43. When AT&T and Verizon eliminated third-party billing for Enhanced Service Providers, the revenue pipeline for the Enhanced Service Providers quickly dried up, leaving the BSG Entities facing an enormous indemnity obligation to those LECs for the Class Action claims, attorneys' fees and expenses attributable to the Enhanced Service Providers.

44. Beginning in late 2011 (in the case of AT&T) and 2012 (in the case of Verizon), the LECs proactively began imposing assessments on revenue streams generated from the BSG Entities' PARs to secure the BSG Entities' indemnity obligations to the LECs.

45. The BSG Entities eventually sued the Enhanced Service Providers in multiple lawsuits. One such lawsuit was commenced in 2017, styled *BSG Clearing Solutions North America, LLC v. Voiceexpress, Inc.*, Civ. No. 5:17-cv-780 (DAE) (W.D. Tex.) in which BSG sued a host of Enhanced Service Providers, alleging, *inter alia*, breach of contract, violation of the Racketeer Influenced and Corrupt Organizations ("RICO") Act and alter ego resulting from the Enhanced Services Provider's rampant fraud.

46. The Voiceexpress Complaint alleged that BSG's indemnity obligation to the LECs

resulting from the defendants' fraud was $38.5 million. (Complaint, ¶ 4 at p. 2, Docket No. 1.)

BSG alleged that the Enhanced Service Provider's fraudulent practices precipitated the Class

Actions and exposed BSG to a massive indemnity obligation:

> Cramming—the process of tacking unauthorized charges onto a consumer's phone bill—costs Americans over $2 billion each year. ***The defendants [enhanced billers] in the case are at the center of a vast scheme that has defrauded consumers out of hundreds of million dollars.*** The defendants have fraudulently charged consumers for phone-based services which were either not authorized, not provided, or both. They then submitted these fraudulent charges to BSG, ESBI, and ACI for processing. BSG, ESBI, and ACI are agents who process and manage the billing for the country's largest phone companies (called local exchange carriers or "LECs").
>
> ***Once this fraud was discovered, a chain reaction took place: consumers filed multiple class actions against the LECs who sought indemnity***, pursuant to their contractual arrangements, from BSG, ESBI, and ACI. Now, BSG, ESBI, and ACI seek indemnity and other damages from the individuals who manipulated corporate shams to defraud Americans out of millions of dollars.

*Id*. at ¶¶ 1-2. (Emphasis added.)

47. Although the Class Action settlements mainly involved claims pertaining to the

cramming of enhanced services, both settlements provided for the dissemination of broad class

notices to AT&T and Verizon customers and permitted the submission of claims for traditional

telecommunications services, including long distance services provided by Plaintiff in this action.

48. For example, one of the notices to the class in the AT&T class action provided in part:

> If you were billed for Third-Party Charges on your AT&T <u>landline</u> telephone bill and you did not authorize the charges, you may be entitled to a payment from this class action settlement.[7]

49. The notice to the class in the Verizon class action provided in part:

---

[7] *Settlement Stipulation and Agreement*, Docket No. 153-2 Exhibit 6 at p. 1, December 28, 2012, *Nzabueze v. AT&T, Inc.*, 3:09-cv-01529 (N.D. Cal.).

CLASS ACTION SETTLEMENT NOTICE . . . You Received This Notice Because Verizon's Records Indicate You Were Billed For Third Party Charges between April 27, 2005 and February 28, 2012 and May Be Entitled to a Payment From This Class Action Settlement.[8]

50. The class notice in the AT&T case was disseminated to 23 million AT&T customers and more than 16 million claims were filed as of November 2013.[9]

51. Likely due to the broadly worded and widely disseminated class notices, class members submitted claims against Plaintiff (and other IXCs who bill under Plaintiff's Service Agreement with Defendant).

52. The claims process in the AT&T and Verizon class actions differed in that claims asserted against legitimate billings of long distance IXCs like Plaintiff had a greater ability to challenge claims in the AT&T class action than in the Verizon class action. Specifically, the AT&T claims process allowed the submission of proof that sales were legitimate more so than in the Verizon case.

53. BSG has only sued Enhanced Service Providers and did not sue Plaintiff.

54. Unlike the Enhanced Service Providers, Plaintiff and the other IXCs it represents are legitimate IXCs, most of which have been operating since 2001, and employ strict controls to prevent cramming in the sales of their regulated long distance services, using verification and quality control techniques that go above and beyond those required by the various regulatory authorities in whose jurisdictions Plaintiff operates.

55. Defendant continues to provide LEC Billing and direct billing services to Plaintiff.

---

[8] *Order* [granting final approval of class action settlement] Docket No. 196, August 28, 2013 at p. 26 lines 19-23, *Moore v. Verizon Communications, Inc.*, 4:09-cv-01823 (N.D. Cal.).

[9] *Order Granting Final Approval of Class Action Settlement*, Docket No. 247, November 27, 2013 at pp. 8-9, lines 26-5, *Nzabueze v. AT&T, Inc.*, 3:09-cv-01529 (N.D. Cal.).

56. The AT&T class action received preliminary approval of the class action settlement in early 2013 and final approval on November 27, 2013.

57. The Verizon class action received preliminary approval of the class action settlement in 2012 and final approval on August 28, 2013.

58. Both settlements provided for injunctive relief to change offending practices, refunds/payments to customers who submitted valid claims, and attorneys' fees.

59. The administration of the settlements took years to complete and according to BSG was still ongoing as of September 21, 2018.[10]

**E.    FTC Enforcement Actions Against Defendant and the Other BSG Entities.**

60. While the BSG Entities attempt to portray themselves as victims of the Enhanced Service Providers in the lawsuits they brought against the providers, the BSG Entities themselves were subjects of multiple FTC enforcement actions for facilitating cramming and profiting from the unlawful practice.

61. One such action was brought in 1998 in this Court, styled *FTC v. Hold Billing Services*, 5:98-CV-00629-FB (W.D. Tex.). The case was concluded in 1999 by the Defendants stipulating to the entry of a permanent injunction prohibiting them from engaging in cramming and other deceptive LEC Billing practices, (hereinafter referred to as the "1999 FTC Injunction.").[11]

62. On April 4, 2012, the FTC filed a motion to hold the ***BSG Entities*** (including

---

[10] *See*, *e.g.*, Affidavit of Bridget A. Mimari in *BSG Clearing Solutions North America, LLC v. Voiceexpress, Inc.*, Civ. No. 5:17-cv-780 (DAE) (W.D. Tex.), Docket No. 99-4 at ¶¶ 11-12 and footnotes 1 and 2.  Bridget Mimari is an officer and general counsel of BSG.

[11] *Stipulated Final Judgment and Order for Permanent Injunction and Consumer Redress as to Defendants Hold Billing Services, LTD, HBS, Inc., Avery Communications, Inc. and Thomas M. Lyons*, Docket No. 65 at pp. 13-18 dated September 22, 1999, *FTC v. Hold Billing Services*, 5:98-CV-00629-FB (W.D. Tex.).

Defendant) in contempt for violating the 1999 FTC Injunction for "putting more than $70 million in bogus charges on consumers' phone bills for 'enhanced services,' such as voicemail and streaming video, that consumers never authorized or even knew about."[12]

63. The FTC's Contempt Motion was filed solely to remedy the BSG Entities' conduct relating to the cramming of "enhanced services" and *did not* involve or relate to Plaintiff (or other IXCs who billed under the Services Agreement).

64. On April 4, 2014, following a ten-day evidentiary hearing, Magistrate Judge Bemporad issued a lengthy Report and Recommendation that recommended the FTC's request for a finding of contempt be granted in part.[13]

65. The Magistrate Judge found in part that one of BSG's subsidiaries,

> ESBI clearly should have known that, due either to ***willful fraud or gross negligence***, the Landeen voicemail service providers were submitting bills for unauthorized accounts, but for months it took no action to protect telephone customers from this hazard.

(R&R at p. 25, n.27, Docket No. 232.) (Emphasis added).

66. On May 19, 2016, the BSG Entities settled the contempt proceeding by entering into a *Stipulated Order for Permanent Injunction and Monetary Judgment* that superseded the 1999 Injunction and additionally required BSG to pay $5.2 million to the FTC ("2016 FTC Order").[14]

---

[12] *Federal Trade Commission's Motion for an Order to Show Cause Why Billing Services Group North America, Inc.; HBS Billing Services Company; Enhanced Billing Services, Inc.; Billing Concepts, Inc.; and ACI Billing Services, Inc. Should Not Be Held in Contempt FTC v. Hold Billing Services*, Docket No. 65 at pp. 13-18 dated April 4, 2012 filed in *FTC v. Hold Billing Services*, 5:98-CV-00629-FB (W.D. Tex.), (hereinafter referred to as the "FTC's Contempt Motion.")

[13] *Revised Report and Recommendation of the United States Magistrate Judge*, Docket No. 232 dated April 4, 2012 filed in *FTC v. Hold Billing Services*, 5:98-CV-00629-FB (W.D. Tex.).

[14] *Stipulated Order for Permanent Injunction and Monetary Judgment*, Docket No. 253 dated May 19, 2016, *FTC v. Hold Billing Services*, 5:98-CV-00629-FB (W.D. Tex.).

67. The 2016 FTC Order contains several important findings and orders, including:

a.      Defendant Billing Concepts, Inc., as one of the "BSG Entities" in the contempt proceeding, is bound by the 1999 FTC Injunction.[15]

b.      All of the BSG Entities were in civil contempt for violating Section III of the 1999 FTC Injunction.

c.      A joint and several $5.2 million judgment was entered against all of the BSG Entities to cover "consumer redress."[16]

d.      "The facts alleged in the Motion to Show Cause will be taken as true, without further proof, in any subsequent civil litigation by or on behalf of the Commission, including in a proceeding to enforce its rights to any payment or monetary judgment pursuant to this Order, such as a nondischargeability complaint in any bankruptcy case." [17]

e.      "The facts alleged in the motion to show cause establish all elements necessary to sustain an action by the commission pursuant to section 523(a)(2)(a) of the Bankruptcy Code, 11 U.S.C. § 523(a)(2)(a), and this order will have collateral estoppel effect for such purposes." [18]

68. Section 523(a)(2)(a) of the Bankruptcy Code provides for the nondischargeability of obligations that arise from obtaining money, property, services, or credit by "false pretenses, a

---

[15] *Id*. at Finding No. 2.

[16] *Id*. at Finding No. 10.

[17] *Id*. at Order § IF.

[18] *Id*. at Order § IG.

false representation, or actual fraud."

**F.    Class Action Holdbacks.**

69. As noted above, beginning in 2011 in the case of AT&T, and 2012 in the case of Verizon, money was withheld from Plaintiff's PARs to pay for or secure BSG's indemnity obligations to the LECs.

70. Defendant advised Plaintiff that the LECs similarly withheld money from other IXCs, the Enhanced Service Providers, and other customers who utilized the BSG Entities' LEC Billing services. BSG's public financial statements confirm that tens of millions of dollars were withheld as reserves to fund BSG's Class Action indemnity obligations to the LECs.

**G.    Defendant Breached the Services Agreement by Failing to Provide an Adequate Accounting to Plaintiff for the Class Action Holdbacks and by Retaining at Least $1.5 Million Owed to Plaintiff for PARs Purchased by Defendant.**

71. The Services Agreement requires Defendant to account for and pay Plaintiff for valid PARs when amounts withheld from the PARs are determinable and can be allocated to Plaintiff.

72. Section 12(c) of the Services Agreement limits Plaintiff's indemnity obligations to claims that arise from or relate to Plaintiff's conduct or Plaintiff's billing records.  The Services Agreement does not require Plaintiff to indemnify Defendant for claims that (a) arise from Defendant's own gross negligence or willful misconduct, (b) for Defendant's obligations that are unrelated to Plaintiff's conduct or billing records, nor (c) for obligations created by the Enhanced Service Providers or other unrelated customers of Defendant or the BSG Entities.

73. In a letter Bridget Mimari sent to Plaintiff on  February 7, 2019 and in the aforementioned Affidavit she filed in the *Voiceexpress* litigation,[19] she acknowledged that the

---

[19] *BSG Clearing Solutions North America, LLC v. Voiceexpress, Inc.*, supra Docket No. 99-4 at ¶¶ 13-24.

Services Agreement and this Court's decision in *Better Benefits Organization, Inc. v. BSG Clearing Solutions North America, LLC*, Civ. No. 5:14-CV-00242-JWP, 2016 WL 7486366 (W.D. Tex. Feb. 4, 2016) require Defendant to only assess Plaintiff for its "proportionate and equitable" share of the Class Action obligations.

74. The *Better Benefits* decision also mandates that when Defendant accounts for the Class Action assessments it must produce the underlying documentation supporting Defendant's calculations. *Id*. at *6 ("The documentation underlying [BSG's] allocation calculations are essential in determining what amount of money, if any, is owed by plaintiffs to defendants. For that reason, the Court believes that [BSG] should produce all available documents that support their damage calculations to the extent they have not already done so.")

75. According to the Affidavit of Bridget Mimari submitted in the *Voiceexpress* litigation, the Class Action claims administration process was still ongoing as of September 18, 2018 (the date she filed the Affidavit) which prevented BSG from being able to provide full and final accountings.[20]

76. On November 12, 2018, after learning another long distance reseller was provided accounting information from BSG pertaining to the Class Action holdbacks, Scott White emailed Bridget Mimari to renew earlier requests Plaintiff had made for an accounting of the Class Action holdbacks. The request was ignored.

77. On January 2, 2019, Plaintiff sent a formal default notice to Defendant for failing to account for and pay any excess Class Action holdbacks to Plaintiff. Plaintiff also gave notice of two additional breaches of the Services Agreement and provided Defendant with the opportunity to cure the breaches.

---

[20] *See* footnote 10, *supra*.

78. On January 17, 2019, Bridget Mimari, Norman Phipps (CEO of BSG), Scott White and Plaintiff's counsel participated in a conference call in which Bridget Mimari agreed to provide an accounting. Following the call, Bridget Mimari emailed Scott White a spreadsheet purporting to list claims submitted by class members in the Class Actions that were attributable to Plaintiff. The information was essentially meaningless and Scott White immediately asked for an explanation of what had been provided.

79. On February 7, 2019, Bridget Mimari emailed Scott White a letter purporting to present "a thorough and detailed analysis of your account balance history to include the AT&T and Verizon Class Action obligations" and included a copy of the *Better Benefits* decision, claiming to have followed the decision in providing the analysis.

80. The February 7, 2019 letter purported to account for and allocate direct expenses and Plaintiff's proportionate share of "shared" Class Action expenses to Plaintiff. The information in the letter had not been previously provided to Plaintiff.

81. The February 7, 2019 letter did not show the amounts withheld by Defendant for the Class Actions, the "net claims" attributable to Plaintiff, the account balances, nor did it include any source documents or data from which the information could be verified.

82. After receiving follow-up demands from Plaintiff, Defendant provided a summary of Plaintiff's net claims, told Plaintiff which codes represented the Class Action withholdings in historical reports, and sent some additional reports that were not meaningful.

83. Scott White pointed out the continued deficiencies in subsequent emails sent in February 2019.

84. The information provided in 2019 is inadequate to calculate the amount of money withheld from Plaintiff and to determine whether any of the information is accurate because source

documents were not provided.

85. The February 7, 2019 letter and the additional information provided was insufficient to comply with Defendant's accounting obligations under the Services Agreement and the *Better Benefits* decision and is a breach of Defendant's duty to account.

86. Since Defendant refused to account for the total amounts it withheld from Plaintiff's PARs for the Class Action, Plaintiff's staff undertook the daunting task of extracting the dozens of entries from a multitude of reports and totaling the amounts denoted by the cryptic codes that Defendant claimed represented the Class Action holdbacks. Plaintiff's analysis shows that Defendant withheld at least $1.762 million.

87. The information provided by Defendant in February 2019 shows Plaintiff's direct expenses and proportionate allocation of "shared expenses," totaled only $183,310, meaning that Defendant owes Plaintiff at least $1.579 million.[21]

88. Contrary to the opening paragraph of Bridget Mimari's February 7, 2019 letter, the information provided by Defendant did not show Plaintiff's "account balance."  Instead, the letter simply showed gross claims filed with the class action administrator, and some of the alleged direct and shared expenses.

89. The Services Agreement and common law require Defendant to fully account for and

---

[21] The $183,310 amount was calculated by adding the alleged direct and shared expenses allocated to Plaintiff in Bridget Mimari's February 7, 2019 letter totaling $104,923 to the alleged net claims paid to class members provided in a separate spreadsheet on February 15, 2019 totaling $78,387.57.

The net claims were substantially less than the class members gross claims totaling $421,204. The February 7 letter indicates that "BSG timely challenged several of the claims . . ."  Plaintiff was not provided information on whether all of the claims that could have been challenged or were challenged. Plaintiff (and the IXCs it bills for) sales calls are verified by a third-party verification service, so it is unlikely any of the sales involved cramming.

remit to Plaintiff all money that was not used to satisfy Plaintiff's proportionate share of obligations for the Class Actions arising from or relating to Plaintiff's billing records.  Defendant has breached the Services Agreement by not fully accounting for and remitting all funds to Plaintiff.

**H.     Defendant Wrongfully Imposed a Rate Increase on Plaintiff.**

90. The Services Agreement sets the rates charged for processing fees for the LEC Billing services that Defendant provides to Plaintiff.   The processing fees are calculated based on the number of billing records that are submitted from Plaintiff to Defendant for processing.

91. On January 1, 2017, the Services Agreement was renewed for another three-year term. The processing fees and other charges payable to Defendant were specified in the Agreement and fixed for the three-year term.

92. In October 2017, Defendant's executives spoke with Scott White about a potential eight percent rate increase.

93. Scott White indicated he wanted to review the request and a call was scheduled for the following week to further discuss Defendant's request.

94. Defendant did not follow through with the scheduled call and Scott White assumed that Defendant had decided not to proceed with the rate increase.

95. Section 22 of the Services Agreement provides that modifications, amendments, waivers or consents are only effective if they appear in a writing signed by or on behalf of the party against whom such modification, amendment, waiver or consent is claimed.

96. In or about December 2017, Defendant unilaterally imposed a rate increase without notifying Plaintiff or obtaining Plaintiff's verbal or written consent.

97. To make matters worse, Defendant did not impose an eight percent rate increase on the

processing fees as explained to Scott White in the October 2017 phone call.  Rather, Defendant imposed an eight percent surcharge on gross billings, which was an increase greater than 300% in the processing fees charged to Plaintiff.

98. Plaintiff's staff did not discover the rate increase until March 2018, and Scott White promptly objected via email and asked for a refund of the overcharges.

99. In March and April 2018, there were follow up email exchanges between Plaintiff and Defendant, but the parties were unable to agree on a rate increase and Scott White continued to object and ask for a refund of the overcharges.  Scott White nonetheless offered to continue discussions regarding a potential rate increase.

100.    Defendant ignored the requests for further discussions, ignored the request to reinstate the contractual rates, did not refund the overcharges, and continue to unilaterally impose the surcharge on Plaintiff's billings.

101.    Because Defendant deducts its fees from Plaintiff's PARs, Plaintiff has no ability to reject or "not pay" the unauthorized rate increase.

102.    In Scott White's January 2, 2019 default letter, he provided formal written notice of default and provided Defendant with the opportunity to cure by restoring the contractual rates and issuing a refund of the overcharges for processing fees.

103.    Defendant has failed to cure the default, continues to impose the surcharge, and is consequently in breach of the Services Agreement by charging Plaintiff processing fees in excess of the contractual rates provided for in the Services Agreement.

104.    Plaintiff is entitled to an accounting, a refund of the overcharges and an order requiring Defendant to cease and desist from charging the excessive processing fees.

105.    Plaintiff estimates that the past overcharges are in excess of $380,000 as of January

31, 2019 and continue to increase on a weekly basis.

106.     Since the billing revenue fluctuates on a monthly basis, Plaintiff is unable to accurately project the future overcharges at this time.

107.     Section 14(b)(ii) of the Services Agreement provides for the recovery of attorneys' fees, costs and expenses by the non-defaulting party from the defaulting party.

## CAUSES OF ACTION

### COUNT 1
### BREACH OF CONTRACT

108.     Plaintiff re-alleges and incorporates the preceding paragraphs of the Complaint.

109.     Plaintiff and Defendant are parties to a valid and enforceable contract in the form of the Services Agreement, as amended.

110.     Plaintiff performed its obligations under the Services Agreement.

111.     Defendant breached the Services Agreement by:

a.     failing to properly account for the money withheld for the Class Actions;

b.     failing to pay Plaintiff the excess money withheld for the Class Actions in an amount to be determined at trial, but which is at least $1.579 million;

c.     failing to honor the agreed-upon contractual rates for processing fees and unilaterally imposing the eight percent surcharge described above;

d.     failing to provide an accounting of the overcharges for the processing fees;

e.     failing to remit the unauthorized processing fee overcharges imposed upon Plaintiff in an amount to be determined at trial, but which is at least $380,000 as of January 31, 2019; and

f.     Failing to cease and desist from continuing to impose the eight percent surcharge on Plaintiff's billings

all in violation of the Services Agreement, including, without limitation, Sections 6, 7, 8, 12, and 14.

112.    Defendant should be ordered to immediately cease and desist from the continued withholding of the Class Action holdbacks in excess of Plaintiff's proportionate share of the Class Action obligations and the continued billing of processing fees at rates in excess of the contractual rates provided for in the Services Agreement.

113.    Defendant's breach of contract has caused injury to Plaintiff, and Plaintiff is entitled to damages in an amount to be determined at trial.

114.    Plaintiff has engaged the undersigned counsel to enforce its rights in this matter. Under Section 14(b)(ii) of the contract and Chapter 38 of the Texas Civil Practice and Remedies Code, Plaintiff is entitled to recover its reasonable and necessary attorneys' fees incurred to enforce the Contract.

## COUNT 2
## ACCOUNTING

115.    Plaintiff re-alleges and incorporates the preceding paragraphs of the Complaint.

116.    Defendant is obligated under the Services Agreement and common law to provide a full and accurate accounting for the funds withheld in the Class Actions, to properly allocate only Plaintiff's proportionate share of the Class Action obligations and refund any excess withheld funds to Plaintiff in an amount to be determined at trial.

117.    Defendant is obligated under the Services Agreement and common law to provide a full and accurate accounting for the overcharges for the eight percent surcharge imposed on Plaintiff's gross billings in excess of the contractual rates in the Services Agreement and refund all such excess charges to Plaintiff in an amount to be determined at trial.

118.    Plaintiff has engaged the undersigned counsel to enforce its rights in this matter.

Under Section 14(b)(ii) of the contract and Chapter 38 of the Texas Civil Practice and Remedies Code, Plaintiff is entitled to recover its reasonable and necessary attorneys' fees incurred to enforce the Contract.

## CONDITIONS PRECEDENT

119.   All conditions precedent to Plaintiff's right to recover are satisfied.

## JURY DEMAND

120.   Plaintiff demands a jury trial.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff requests that the Court, upon final hearing, enter its judgment against Defendant on all claims, awarding Plaintiff the following relief:

A.   All compensatory damages, whether general or special;

B.   Ordering Defendant to immediately cease and desist from the continued withholding of Class Action money owed to Plaintiff and the continued billing of processing fees in excess of the contractual rates provided for in the Services Agreement;

C.   Ordering Defendant to provide Plaintiff with a full and accurate accounting, including documents and data upon which the accountings are based and payment of all funds that are due and owing to Plaintiff under the Services Agreement and common law in an amount to be determined at trial;

D.   Attorney's fees through trial and all appeals;

E.   Court costs;

F.   Prejudgment and post-judgment interest at the highest lawful rates; and

G.   All other relief, at law or in equity, to which Plaintiff may be entitled.

Respectfully submitted,


/s/ Mark J. Barrera
Mark J. Barrera
State Bar No. 24050258
THE BARRERA FIRM
424 E. Nueva
San Antonio, Texas 78205
210.244.5858 tel.
210.224.5890 fax
mark@thebarrerafirm.com


PERRY & PERRY, PLLP
Shawn M. Perry
(subject to admission in this court)
Minn. Bar No. 185000
West End Plaza, Suite 336
1660 Highway 100 South
Minneapolis, MN  55416
952.546.3845 tel.
952.546.3855 fax
shawn.perry@pppllp.com


**_Attorneys for Plaintiff_**