IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| LEGENT COMM, LLC, | § | |
| | § | |
| *Plaintiff,* | § | SA-19-CV-00202-ESC |
| | § | |
| vs. | § | |
| | § | |
| BILLING CONCEPTS, INC., | § | |
| | § | |
| *Defendant.* | § | |

## ORDER

Before the Court in the above-styled cause of action is Defendant Billing Concept, Inc.'s Motion for Summary Judgment on the Parties' Contractual Limitation of Liability [#50]. In evaluating the motion, the Court has also considered Plaintiff's Response in Opposition [#53], Defendant's Reply [#54], and Plaintiff's Surreply [#58]. For the reasons that follow, the Court will **DENY** the motion.

## I.  Background

This is an action for breach of contract and an accounting arising out of a Services Agreement between Plaintiff Legent Comm, LLC ("Legent") and Defendant Billing Concepts, Inc. ("BCI"). Legent's Second Amended Complaint [#31] is the live pleading in this action. BCI has moved for summary judgment on one of its affirmative defenses, arguing that all of Legent's claims are subject to a contractual liability limitation provision, which caps Legent's potential recovery in this suit.

This Court has diversity jurisdiction over the parties and claims asserted in this action. *See* 28 U.S.C. § 1332.  The undersigned has authority to enter this Order due to the parties' consent to the jurisdiction of a United States Magistrate Judge.  *See id.* at § 636(c).

## II.  Facts Supported by the Record

Unless otherwise noted, the following undisputed facts are established by the summary judgment record for purposes of the motion before the Court.  Legent is a state and federally regulated telecommunications Interexchange Carrier ("IXC") that provides long distance telephone service to residential and business customers.  (White Decl. [#53-1] at  3.)  Legent purchases and resells its telecommunications services and is known in the industry as a "reseller."  (*Id.*)  A local telephone company that is authorized to provide landline telephone services in a particular geographic region is called a Local Exchange Carrier ("LEC").  (*Id.*) Legent has the choice of either sending its bill directly to the customer or having long-distance charges included on the LEC's landline telephone bill to that customer.  (*Id.* at ¶ 4.)  When a LEC provides the service of including third-party charges on its bills, that service is called "third-party billing" or "LEC billing."  (*Id.*)

BCI is one of several operating subsidiaries of Billing Services Group Limited ("BSG"), a publicly traded British holding company.  (Second Am. Compl. [#31] at ¶ 3.)  BCI is a billing clearinghouse that aggregates third-party telecommunications charges (like the long-distance charges billed by Legent) in order to facilitate the billing by LECs without requiring Legent to negotiate separate agreements with each LEC across the country.  (White Decl. [#53-1] at ¶ 5.)

Legent and BCI entered into a Services Agreement (entitled One Plus Billing and Information Management Services Agreement) in September of 2001 to govern their LEC billing arrangement.  (*Id.* at ¶ 8.)  The Services Agreement has been renewed and amended over the

2

years.  (*Id.*)  Under this agreement, (1) Legent submits its billing records to BCI in a standardized electronic format; (2) BCI processes and distributes the records to various LECs in a form acceptable to those LECs; (3) the LECs collect payments from Legent's customers and remit the funds, less the LEC fees and other amounts to BCI; and (4) BCI then remits the funds less its fees and other amounts to Legent.  (*Id.* at ¶ 6.)

The LEC billing process is more complex than this simplified description because there are typically thousands of billing records "in the pipeline" at any given time and payments are often made in advance of collections with reserves applied to cover fees, expenses, holdbacks, and other deductions, which are periodically reconciled using adjustments referred to as "true-ups."  (*Id.* at ¶ 7.)  Additionally, the LEC billing process is effectuated by the purchase and sale of accounts receivable, not just collection and payment.  (*Id.* at ¶ 9.)  When Legent submits billing records to BCI, BCI purchases the accounts receivable generated by BCI's billing records, and BCI in turn resells the accounts receivable to the LEC.  (*Id.*)

In addition to providing billing services to Legent and other providers of long-distance telephone service, BCI also allegedly provides billing services to companies that provide "enhanced services," such as website hosting, directory listings, e-mail, voicemail, and streaming video services.  (*Id.* at ¶ 11.)  According to Legent, these services are unregulated, which led some companies to engage in "cramming"—the practice of placing unauthorized enhanced-services charges on a customer's LEC bill without valid consent.  (*Id.* at ¶ 12.)

In April 2009, two class action lawsuits were commenced against AT&T and Verizon for cramming stemming from LEC billing originated by BCI's parent company and other billing-clearinghouse aggregators.  (*Id.* at ¶ 13.)  Neither Legent nor any of the IXCs who submit LEC billing pursuant to a Services Agreement with BCI were parties to the class actions.  (*Id.*)  As a

consequence of the class actions, BCI and other BCI entities invoked certain protections in the Services Agreements governing their relationships with Legent and other IXCs. Specifically, they withheld from Legent and other IXCs the funds generated from processing their billing records until the offsets, charge-backs, refunds, and LEC fees and assessments could be proportionally allocated to each of the IXCs responsible for satisfying the consumers' claims in the class actions and the consequential offsets, charges, fees, and other assessments imposed by the LECs in the class actions. (*Id.* at ¶ 14.)

In November 2018, Legent contacted BCI and requested an accounting of these "class action holdbacks." (*Id.* at ¶ 18.) Legent claims that BCI ignored the request, and that therefore it sent a formal default notice to BCI for failing to account for and pay any excess class action holdbacks to Legent. (*Id.*) Legent also gave BCI notice of two additional alleged breaches of the Services Agreement and provided BCI with the opportunity to cure the breaches. (*Id.*) BCI ultimately provided an accounting, which Legent contends was incomplete, and Legent requested an explanation. (*Id.*) In response, BCI sent Legent a February 7, 2019 letter purporting to account for and allocate all direct expenses and Legent's proportionate share of the class action expenses to Legent. (*Id.* at ¶ 19.) Legent was still unsatisfied with the response and all subsequent information provided. (*Id.* at ¶¶ 20–21.)

According to Legent, BCI withheld at least $1.762 million in class action holdbacks, but after conducting discovery in this case, Legent contends a more accurate estimate could be as high as $2.015 million. (*Id.* at ¶¶ 23–24; Second Am. Compl. [#31] at ¶¶ 88–89.) Legent concedes that BCI was permitted to holdback certain direct expenses and a proportionate allocation of expenses but calculates the appropriate holdback amount to be only $183,310, and therefore believes BCI should pay Legent between $1.579 and $1.832 million for unauthorized,

excessive holdbacks.  (White Decl. [#53-1] at ¶ 25; Second Am. Compl. [#31] at ¶¶ 88–89.) Legent contends BCI's failure to fully account for and remit all funds that were not used to satisfy Legent's proportionate share of obligations for the class actions constitutes a breach of the parties' Service Agreement.  (Second Am. Compl. [#31] at ¶¶ 92, 115.)

Legent's second breach-of-contract claim is that BCI breached the Services Agreement by unilaterally imposing a rate increase in the processing fees charged Legent without notifying Legent or obtaining Legent's verbal or written consent.  (*Id.* at ¶¶ 96, 111.)  Legent claims that BCI improperly imposed an eight percent surcharge on all gross billings starting with the December 2017 billing submissions, which constitutes an increase greater than 300% in the processing fees charged to Legent.  (*Id.* at ¶ 107.)

In addition to its breach-of-contract claims, Legent sues BCI for an accounting, arguing that BCI is obligated under the Services Agreement and common law to provide a full and accurate accounting with respect to the holdbacks and the excessive processing fee.  (*Id.* at ¶¶ 129–31.)

In the motion before the Court, BCI contends that even if Legent could prevail on a breach-of-contract or accounting claims in this lawsuit, Legent's recovery in this lawsuit is limited by Section 12(d) to the amounts described in that limitation-of-liability provision.  This is the sole issue before the Court, as BCI has only moved for summary judgment on this affirmative defense, and not on any of Legent's claims.

### III.  Summary Judgment Standard

Summary judgment is appropriate under Rule 56 of the Federal Rules of Civil Procedure only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the

moving party is entitled to a judgment as a matter of law." *Celotex Corp. V. Catrett*, 477 U.S. 317, 322 (1986); *see also* Fed. R. Civ. P. 56(c).  A dispute is genuine only if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

When summary judgment is sought on an affirmative defense, as here, the movant must establish "beyond peradventure" all of the essential elements of the defense to warrant judgment in its favor.  *Dewan v. M-I, L.L.C.*, 858 F.3d 331, 334 (5th Cir. 2017) (quoting *Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1194 (5th Cir. 1986)).  The burden on a party seeking to prove its affirmative defense on summary judgment has been described as a "heavy" one.  *See, e.g.*, *Cont'l Cas. Co. v. St. Paul Fire & Marine Ins. Co. ("Continental I")*, No. CIV A 304CV1866-D, 2007 WL 2403656, at *10 (N.D. Tex. Aug. 23, 2007).

Once the movant carries its burden, the burden shifts to the nonmoving party to establish the existence of a genuine issue for trial.  *Anderson*, 477 U.S. at 248; *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Wise v. E.I. Dupont de Nemours & Co.*, 58 F.3d 193, 195 (5th Cir. 1995).  The non-movant must respond to the motion by setting forth particular facts indicating that there is a genuine issue for trial.  *Miss. River Basin Alliance v. Westphal*, 230 F.3d 170, 174 (5th Cir. 2000). The parties may satisfy their respective burdens by tendering depositions, affidavits, and other competent evidence.  *Topalian v. Ehrman*, 954 F.2d 1125, 1131 (5th Cir. 1992). The Court will view the summary judgment evidence in the light most favorable to the non-movant.  *Rosado v. Deters*, 5 F.3d 119, 123 (5th Cir. 1993).

"After the non-movant has been given the opportunity to raise a genuine factual issue, if no reasonable juror could find for the non-movant, summary judgment will be granted."  *Westphal*, 230 F.3d at 174.  However, if the party moving for summary judgment fails to satisfy

its initial burden, the motion must be denied, regardless of the nonmovant's response.  *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc).

## IV.  Analysis

The Court will deny BCI's motion for summary judgment.  BCI has not established "beyond peradventure" that the limitation-of-liability provision in the parties' contract unambiguously limits Legent's possible remedies on the breach-of-contract and accounting claims asserted in this action.  *See Dewan*, 858 F.3d at 334.

The summary judgment record contains a copy of the parties' Services Agreement, which was executed on September 14, 2001, and an amendment to the contract dated January 20, 2005. (Services Agreement [#50-1] at 3–24; Amendment [#50-1] at 1.)  The Services Agreement was executed between BCI (referred to in the contract as "Company") and Legent (referred to in the contract as "Customer") for certain "billing and information management services."  (Services Agreement [#50-1] at 3.)  To decide BCI's motion for summary judgment, the Court must construe the parties' contract and interpret the limitation-of-liability provision contained therein.

The parties agree that Texas law governs the construction of the parties' contract in this diversity action.  (Services Agreement [#50-1] at 12 (selecting Texas law to govern the contract); Mtn. for Summary Judgment [#50] at 2 (arguing motion under Texas law); Response [#53] at 20 (applying Texas law to contract construction).)  When the meaning of a contract is disputed, the Court's primary objective "is to give effect to the written expression of the parties' intent." *Pathfinder Oil & Gas, Inc. v. Great W. Drilling, Ltd.*, 574 S.W.3d 882, 888 (Tex. 2019).  "A written instrument that can be given a certain or definite legal meaning or interpretation is not ambiguous and will therefore be construed as a matter of law."  *Id.*  "An unambiguous contract will be enforced as written, and parol evidence will not be received for the purpose of creating an

7

ambiguity or to give the contract a meaning different from that which its language imports." *David J. Sacks, P.C. v. Haden*, 266 S.W.3d 447, 450 (Tex. 2008).  "On the other hand, if the contract is subject to two or more reasonable interpretations after applying the pertinent rules of construction, the contract is ambiguous, creating a fact issue on the parties' intent."  *J.M. Davidson, Inc. v. Webster*, 128 S.W.3d 223, 229 (Tex. 2003).  "Whether a contract is ambiguous is a question of law for the court to decide by looking at the contract as a whole in light of the circumstances present when the contract was entered."  *Coker v. Coker*, 650 S.W.2d 391, 394 (Tex. 1983).

The Texas Supreme Court recently reiterated several fundamental rules of contract construction that must be followed by courts construing contracts governed by Texas law.  *See Pathfinder Oil & Gas, Inc.*, 574 S.W.3d at 888–89.  First and foremost, "[a] contract's plain language controls, not what one side or the other alleges they intended to say but did not."  *Id.* at 888 (internal quotation and citation omitted).  Therefore, courts must interpret contract language "according to its plain, ordinary, and generally accepted meaning unless the instrument directs otherwise."  *Id.* (internal quotation and citation omitted).  Second, "[c]ontract terms cannot be viewed in isolation . . . because doing so distorts meaning."  *Id.* at 889.  Courts must therefore "consider the entire writing in an effort to harmonize and give effect to all the provisions of the contract so that none will be rendered meaningless."  *Id.* (internal quotation and citation omitted).  Third, "a specific contract provision controls over a general one."  *Id.*

The parties' dispute centers on Section 12(d) of the parties' Services Agreement.  This section reads in its entirety:

> SECTION 12.  LIMITATION OF LIABILITY AND INDEMNITY.
>
> (d) Notwithstanding anything to the contrary in this Agreement, the liability of Company in any and all categories and for any and all Claims

arising out of this Agreement or out of any act or omission relating thereto will, in the aggregate, not exceed three (3) month's average of Company's Processing Fees charged to Customer over the twelve (12) months preceding the date on which the damage or injury is alleged to have occurred; provided, however, that if this Agreement has not been in effect for twelve (12) months preceding such date, then over such fewer number of preceding months that this Agreement has been in effect. **WITHOUT IN ANY WAY LIMITING THE APPLICATION OF THIS SECTION, THE RIGHT TO RECOVER DAMAGES UNDER THIS PARAGRAPH CONSTITUTES CUSTOMER'S EXCLUSIVE ALTERNATIVE REMEDY IN THE EVENT THAT THE ERROR CORRECTION DESCRIBED ABOVE OR ANY OTHER CONTRACTUAL REMEDY FAILS OF ITS ESSENTIAL PURPOSE.**

(Services Agreement [#50-1] at 10 (emphasis in original).)  BCI argues that Legent's claims are all subject to this provision and therefore Legent can only recover through this lawsuit a maximum of the average of three months of BCI's processing fees charged to Legent over the 12 months preceding Legent's injury.  According to the declaration of Scott A. White, Legent's sole owner and member, three months' average processing fees historically constitute a mere two to four percent of the revenue that BCI pays Legent.  (White Decl. [#53-1] at ¶ 39.)

BCI argues that Section 12(d) unambiguously limits Legent's recovery in this action.  In advancing this argument, BCI relies primarily on the broad definition of "claim" set forth in the Services Agreement.  The contract defines "Claim" as

Claim.  Any claim, dispute, demand, investigation, suit, loss, liability, damage, attorneys' fees and expenses, cost, correction or expense, whether ordinary, special, consequential or otherwise, that may be asserted against any party to this Agreement.  Claim includes all direct damages, including without limitation contract damages and damages for injuries to persons or property, whether arising from a breach of this Agreement, breach of warranty, negligence, strict liability or any other tort with respect to the services provided by Company hereunder.

(Services Agreemetn [#50-1] at 15.)  BCI argues that Legent's claims for breach of contract and for an accounting involve alleged withholding of amounts purportedly owed under the parties'

contract and are therefore predicated on claims of "loss, liability [and] damage" arising exclusively from alleged breaches of the parties' contract.  BCI therefore maintains that all of Legent's claims fall within the definition of "claim" in the contract and are subject to Section 12(d)'s limitations.  BCI's proposed construction of the Services Agreement requires viewing in isolation the first portion of Section 12(d) and the definition of "claim" but ignoring many other provisions in the contract.

To be sure, limitation-of-liability clauses are "generally valid and enforceable." *Bombardier Aerospace Corp. v. SPEP Aircraft Holdings, LLC*, 572 S.W.3d 213, 231 (Tex. 2019).  And under Texas law, contracting parties are free to limit their liability in damages to a specified amount, even if the damages cap is unrelated to the estimate of probable damages resulting from breach.  *Glob. Octanes Tex., L.P. v. BP Expl. & Oil Inc.*, 154 F.3d 518, 522–23 (5th Cir. 1998).  Legent does not argue otherwise.  Legent concedes Section 12(d) is valid and enforceable, but insists it must be read in the context of the entire agreement and maintains that its cap was not intended to prevent Legent from invoking contractual remedies for breaches by BCI of its "core accounting and payment obligations" under other sections of the contract. (Resp. [#53] at 17.)  Viewing the parties' Services Agreement as a whole, and reading Section 12(d) contextually so as to harmonize the entire contract, both of which are required under Texas law, the Court finds that BCI has not met its heavy burden to prevail on its affirmative defense. BCI has not established beyond peradventure that the <u>only unambiguous interpretation of Section 12(d) is that the sole remedy Legent is entitled to in this suit is the average of three months of BCI's processing fees.</u>

The primary relief Legent seeks in this lawsuit is performance under the contract. Legent's Second Amended Complaint prays for injunctive relief in the form of an order that (1)

BCI provide it with a full and accurate accounting of all funds due and owing under the Services Agreement and (2) BCI immediately cease and desist from (a) withholding funds in excess of Legent's proportionate share of the class action holdback liabilities and (b) the continued billing of processing fees in excess of the contractual rates provided for in the Services Agreement. (Second Am. Compl. [#31] at 29.)  Legent also requests the that the Court order BCI to pay all funds due and owing under the Services Agreement and common law in an amount to be determined at trial.  (*Id.*)  Although Legent also requests all compensatory damages, whether general or special, Legent does not identify in its pleadings any additional damages, such as lost profits or other losses resulting from the alleged contractual breach, that it has suffered beyond the alleged failure of BCI to perform its obligations under the contract.

BCI's primary obligation under the Services Agreement is simply to pay Legent the amounts collected from Legent's customers for the services Legent provided (less the agreed-upon processing fees and assessments).  The Services Agreement states that Legent is obligated to "submit its Records to [BCI] for purchase and submission to the LEC" (Services Agreement [#50-1] at § 3(a)) and BCI in turn must "transmit [Legent's] Qualifying Records to the appropriate LECs for billing and collection" (*id.* at § 3(c)).  After the various LECs make payments to BCI for the "Qualifying Records," BCI is obligated to "determine the estimated amount collected by each LEC for [Legent's] Qualifying Records and deduct all assigned and allocated Assessments and Taxes of the LECs and [BCI]"; "advance to [Legent] the estimated amount" at regular intervals determined by the contract; and ultimately make "final payments." (*Id.* at § 8(a).)  The Services Agreement also imposes payment obligations on Legent—to remit to BCI any amounts due in the event of overpayment or when the LEC payments are insufficient to satisfy the allocated assessments imposed by BCI for its services and applicable taxes.  (*Id.* at

11

§§ 4(m), 7(a), 8(a), 9(a).)  Section 13 of the contract provides that upon the expiration or termination of the contract "each party agrees to satisfy, when or before due, their payment obligations under this Agreement."  (*Id.* at § 13(a).)  This lawsuit is Legent's attempt to enforce performance of the parties' contract, not to collect damages for an injury caused by BCI's alleged breach.  Thus, Legent argues Section 12(d) does not bar it from recovering the monies that constitute BCI's core performance obligations in the contract—to remit to Legent the amounts the LECs paid BCI for Legent's services.

Legent's position finds support in Section 14 of the contract, which is entitled "Default and Remedies."  This Section both governs in the event of breach of the parties' agreement and also sets forth the primary available remedies for such breach.  (*Id.* at §§ 14(a), (b).)  BCI's summary judgment motion does not ask the Court to determine whether BCI breached the Services Agreement, only whether Legent's remedies in this lawsuit are limited by Section 12(d).  According to Section 14(b), Legent, as the non-defaulting party, has "the following rights and remedies" in the event of BCI's breach:

(i) To terminate or cancel [the] Agreement . . . ;

(ii) To declare all amounts due under [the] Agreement . . . to be immediately
    due and payable, including reasonable attorney's fees, costs and
    expenses . . . incurred . . . ;

    . . .

(v) All rights and remedies allowed by the Uniform Commercial Code
    except <u>as limited by Section 12 above</u>;

(vi) All other rights and remedies allowed by the Agreement and under
    applicable law <u>as limited by Section 12 above</u>.[1]

_____

[1] Subsections (iii) and (iv) establish remedies specifically available to BCI in the event of Legent's breach and are therefore not listed here.

(*Id.* at § 14(b) (emphasis added).)   Significantly, the limitations imposed by Section 12 are referenced only in the section (v) and (vi) remedy provisions, both of which expressly state that they are "underlined by Section 12 above."   (*Id.* (emphasis added).)   Section 12's limitation is not referenced in conjunction with any other remedy and is conspicuously absent from section (ii). Section 14(b)(ii) provides Legent with the contractual authority to enforce the parties' contract and demand an accounting of all amounts due, and is the only Section 14 remedial provision Legent invokes in its Second Amended Complaint.   (Second Am. Compl. [#31] at ¶¶ 119, 128, 131.)   The Services Agreement's omission of any reference to Section 12 in Section 14(b)(ii) is critical to interpreting the contract in a manner that harmonizes all of the contract's provisions.

Section 12(d) also cross references Section 14, though not explicitly.   In bold and underlined font, Section 12(d) states that "the right to recover damages under this paragraph" is the "exclusive *alternative* remedy" in the event that "any other contractual remedy" (i.e., any remedy set forth in Section 14) "fails of its essential purpose."   (Services Agreement [#50-1] at ¶ 12(d) (emphasis added).)   Each time BCI quotes Section 12(d) in its motion for summary judgment and reply it omits this bold, capitalized, and underlined language from its quotation, asking the Court to view the first part of the limitation-of-liability provision in isolation.   (Mtn. for Summ. J. [#50] at 4; Reply [#54] at 1.)   This the Court cannot do.   *See Pathfinder Oil & Gas, Inc.*, 574 S.W.3d at 889.   Instead, the Court construes the bold, capitalized, and underlined portion of Section 12(d) to emphasize the primacy of Section 14 and other sections of the Services Agreement in establishing the available contractual remedies for breach and default. Legent is pursuing these remedies through its lawsuit for breach of contract and an accounting.

Again, Legent alleges that BCI breached the Services Agreement by (1) failing to properly account for monies withheld for the class actions and (2) unilaterally imposing an eight

percent gross revenue fee on Plaintiff's billing submissions beginning December 2017.  Legent also alleges that (3) BCI is obligated under the Services Agreement and common law to provide a full and accurate accounting and refund all funds due and owing to Plaintiff.  (Second Am. Compl. [#31] at ¶¶ 122–25, 130.)  Legent has not chosen to pursue an *alternative* remedy for damages but rather is seeking to enforce BCI's primary performance obligations under the contract and to determine the amounts due under the contract.  The remedies pursued by Legent through this lawsuit have not failed of their "essential purpose" yet.  And there is no support in the Services Agreement for BCI's position that it, as the allegedly defaulting party, may choose which remedies Legent is entitled to pursue and in doing so avoid performance of its primary contractual obligations.  In fact, BCI's proposed construction of the Services Agreement would allow BCI to intentionally withhold monies it collected from Legent's customers on Legent's behalf, subject only to the requirement that it remit to Legent the small sum contemplated by Section 12(d).

The better construction of the parties' Services Agreement is that Section 12(d) limits the liability of BCI beyond its contractual obligations to correctly process and pay Legent for its submitted and qualifying billing records and does not affect Legent's ability to enforce BCI's performance obligations.  BCI concedes in its reply that Paragraph 12(d) does not and cannot eliminate its contractual obligations.  (Reply [#54] at 7.)  To argue otherwise would obviously go too far.  But BCI still maintains that Paragraph 12(d) limits the remedies Legent is pursuing in this case for breach of those obligations.  (*Id.*)  In doing so, BCI improperly conflates two distinct concepts—performance and damages—by advancing an interpretation that functionally would eliminate its obligations under the contract.

This distinction is illustrated by the case law cited by BCI in support of its motion, none of which directly supports the result BCI advances here. For example, in *North Cypress Medical Center Operating Company Ltd v. Fedex Corporation*, 892 F. Supp. 2d 861 (S.D. Tex. 2012), the parties' contract concerned the shipment of boxes of medical documentation between two Texas cities for the plaintiff. In the process of delivery, one of the boxes was dropped, and some documents, which contained confidential patient information, were lost. *N. Cypress Med. Ctr.*, 892 F. Supp. 2d at 863. As a result, the plaintiff was required to conduct an extensive and expensive investigation pursuant to federal regulations and statutory requirements. *Id.* The plaintiff sued for breach of contract, as well as various tort claims, not to recover the value of the lost documents themselves or to seek replacement performance but for the consequential expenses incurred as a proximate result of the accidental dissemination of confidential patient information. *Id.* at 864. The standard Federal Express U.S. Airbill used for shipping set forth the "Terms and Conditions" of the shipment and limited liability to $100.00 unless a specific higher amount is declared. *Id.* at 869. The airbill also stated that Federal Express is not liable for any damages "whether direct, incidental, special, or consequential in excess of the declared value of a shipment." *Id.* at 869–70. The court limited the plaintiff's recovery for its breach of contract claim to the contractually determined amount of $100.00. *Id.* at 870. This case does not provide any guidance to the Court regarding how to interpret Section 12(d) or how a similar limitation-of-liability provision should be applied to a lawsuit seeking to enforce performance under the contract, as opposed to consequential damages. What would have been analogous would have been if Federal Express had refused to turn over some of the boxes it had been engaged to transport and deliver, and then had claimed it only owed $100 but had no obligation to turn over the boxes in its possession.

15

Similarly, in *Nacol & Company v. ADT Security Services., Inc.*, No. 4:10-CV-00137, 2011 WL 1542716 (S.D. Tex. Apr. 21, 2011), a federal court enforced a limitation-of-liability provision in the parties' contract to remit a jury's damage award from $535,642 to $1,000.  Yet the legal claims at issue in that case also did not seek to enforce contract performance, as here, but instead sought to recover consequential damages resulting from a breach.  The plaintiff was a jewelry store that had been robbed and sought through the lawsuit to recover damages in the amount of lost inventory from its alarm company that had breached the contract by failing to provide a necessary certification of the installed alarm system that prevented the jewelry store from obtaining theft insurance that would have covered the losses.  *Nacol & Co.*, 2011 WL 1542716, at *1–4.  There was no question that the losses the jewelry store suffered were covered by the limitation-of-liability provision, which capped damages and losses "due to a failure of service or equipment in any respect" resulting "directly or indirectly . . . from performance or nonperformance of obligations imposed by the contract . . . ."  *Id.* at *6–7.  In contrast, Legent is not seeking damages that were caused by BCI's failure to perform under the contract; Legent is attempting to secure BCI's performance under the contract.  This case is also inapposite.

In yet another case cited by BCI, a Texas appellate court affirmed a trial court's judgment enforcing a limitation-of-liability clause in the context of an agreement to advertise the plaintiff's company in a Yellow Pages directory.  *Bergholtz v. Sw. Bell Yellow Pages, Inc.*, 324 S.W.3d 195, 196 (Tex. App.—El Paso 2010, no pet.)  The published advertisement contained numerous mistakes about plaintiff's business, such as locations and phone numbers; the plaintiff refused to pay the fee for the ad; the publisher of the Yellow Pages directory sued plaintiff for breach of contract and other claims; and the plaintiff counterclaimed for breach of contract and negligence, seeking damages in the form of lost profits resulting from the erroneous information.  *Id.* at 196–

97.  The parties had agreed to limit damages to the amount actually paid for the advertising in the

Yellow Pages directory and therefore precluded the recovery of lost profits.  *Id.* at 199.  And in

*Bombardier Aerospace Corp. v. SPEP Aircraft Holdings*, LLC, 572 S.W.3d 213, 230–31 (Tex.

2019), a case which BCI repeatedly cites in its briefing, the Texas Supreme Court enforced a

limitation-of-liability provision that barred the recovery of punitive damages.  Punitive damages

are not at issue here.

These cases provide no helpful insights with respect to this case, where Legent is seeking

to enforce BCI's obligation to perform and is not pursuing consequential damages resulting from

the alleged breach. Ultimately, the cases cited by BCI stand only for the proposition that

limitation-of-liability provisions are generally enforceable.  BCI has not directed the Court to any

case law containing a limitation-of-liability provision analogous to Section 12(d) or presenting a

factual context comparable to that at issue here.  BCI cannot simply cite to the general principle

of the enforceability of limitation-of-liability provisions and satisfy its high burden to prevail on

its affirmative defense.

In summary, on the record before the Court, BCI has not established beyond

peradventure that Section 12(d) unambiguously bars Legent from recovering anything in this

lawsuit except for the average of three months of BCI's processing fees.  Although Section 12(d)

may indeed bar Legent from recovering any additional damages beyond contract performance,

that question is not before the Court.   The Court was simply asked whether BCI has

unambiguously established that Legent can recover nothing more from this suit than the remedy

set forth in Section 12(d).  BCI has not.  Accordingly, the Court will deny the motion for

summary judgment.

## V.  Conclusion

Having considered BCI's motion, the response and replies thereto, the record, and the governing law,

**IT IS HEREBY ORDERED** that Defendant Billing Concept, Inc.'s Motion for Summary Judgment on the Parties' Contractual Limitation of Liability [#50] is **DENIED**.

SIGNED this 11th day of June, 2020.

ELIZABETH S. ("BETSY") CHESTNEY
UNITED STATES MAGISTRATE JUDGE

18